OPINION OF THE COURT
Per Curiam.
The Grievance Committee for the Tenth Judicial District served the respondent with a verified petition dated July 17, 2012, containing four charges of professional misconduct. After a preliminary conference on May 28, 2014, and a hearing on July 14, 16 and 29, 2014, the Special Referee sustained all four charges. The petitioner now moves to confirm the report of the Special Referee, and to impose such discipline upon the respondent as this Court deems just and proper. The respondent, by her attorney, cross-moves to disaffirm the report of the Special Referee, and requests that in the event that this Court finds a violation has occurred, the sanction be limited so as not to preclude her from being able to continue to practice law.
Based upon the respondent’s admissions, her sworn testimony, and the other evidence adduced, we find that the facts are as follows:
The respondent is a partner in the law firm of Cronin & Byczek, LLP (hereinafter the firm), and is the partner in charge of the firm’s litigation practice. In or about early 2000, Jose Antonio Romero (hereinafter Romero), who was incarcerated at the Auburn Correctional Facility, contacted the respondent about bringing an action related to the death of his wife, Robin Denise Romero, who died sometime in 1999, shortly after giving birth to their child in a New York City hospital. Romero was serving an 18-year sentence of imprisonment following his conviction for manslaughter in the first degree.
Upon investigation, the firm learned that Robin Denise Romero’s mother, Redell Willis, had retained the law firm of Danker & Milstein, PC. (hereinafter the Milstein firm), to bring an action in the Supreme Court, New York County, on behalf of her daughter’s estate, to recover damages for wrongful death (hereinafter the wrongful death action). On or about May 19, *319 2000, the firm entered into a retainer agreement with Romero (hereinafter the retainer agreement), wherein it was agreed that the firm would represent Romero’s interests with respect to his rights as a distributee of his wife’s estate. Pursuant to the retainer agreement, the firm was entitled to receive one third of any recovery it obtained on Romero’s behalf.
In or about April 2003, the wrongful death action was settled for $1,350,000, and the settlement was approved by the Surrogate’s Court, Bronx County, in a decree dated January 21, 2004 (hereinafter the Surrogate’s decree). Pursuant to Surrogate’s Court Procedure Act § 2222-a (hereinafter SCPA 2222-a), the Surrogate’s decree directed that Romero’s share of the settlement, which was $250,000, could not be distributed “until 30 days from the date of entry of [the] Decree.” In accordance with SCPA 2222-a, on or about March 4, 2004, the Chief Clerk of the Surrogate’s Court forwarded a copy of the Surrogate’s decree to the New York State Crime Victims Board (hereinafter the CVB) via facsimile transmission.
On or about March 12, 2004, the firm received a check from the Milstein firm representing Romero’s share of the settlement in the sum of $250,000 (hereinafter the settlement proceeds). At or about that time, the firm deposited the $250,000 check into the firm’s escrow account at the First Bank of Long Island (hereinafter the escrow account). On March 16, 2004, the firm reimbursed itself for disbursements in the amount of $172.92 by check No. 12531, and issued check No. 12532 to the firm in the sum of $83,275.70 for its fees under the retainer agreement. After issuing these checks, $166,551.38 remained on deposit in the firm’s escrow account on behalf of Romero.
In April 2004, Eamonn Trainor, a senior attorney for the CVB, was contacted by a representative of the firm and advised that the firm was holding approximately $160,000 to $170,000 in settlement proceeds for Romero. After obtaining affidavits from Aida Quiles and Angela Gutierrez (hereinafter together the crime victims), Trainor contacted the firm on April 27, 2004, to confirm that it was still holding the settlement proceeds, and to advise it that the CVB was getting an injunction to “start freezing that money.” An associate at the firm, Kari Caulfield, informed Trainor that the firm was still in possession of approximately $160,000 to $170,000 of the settlement proceeds, and that the money would be held for an additional 21 days. Later that day, in a second call, Caulfield *320 informed Trainor that the firm had decided that the settlement proceeds would be released forthwith. Trainor then sent Caulfield a letter, by facsimile transmission, dated April 27, 2004, in which he noted that the firm was required to provide written notice to the CVB prior to disbursing the settlement proceeds, and asked the firm not to disburse any of the settlement proceeds to Romero in accordance with Executive Law § 632-a (hereinafter the Son of Sam Law). That evening, at the firm’s weekly meeting of the litigation group, the Romero matter was discussed. The respondent, six of the firm’s other attorneys, and one paralegal attended the meeting. Romero was billed for five hours for each of the attendees.
The next day, by letter dated April 28, 2004, the firm notified the CVB for the first time in writing of the firm’s receipt of the settlement proceeds. Also on that day, the respondent sent two attorneys from the firm, James LeBow and Dominick Revel-lino, to the Auburn Correctional Facility to confer with Romero. At the conference, Romero signed a nondurable power of attorney and a retainer agreement (hereinafter the 2004 retainer agreement) with the firm to represent him “regarding any and all motions, suits, actions, litigation and appeals to protect the corpus” of the settlement proceeds. Pursuant to the 2004 retainer agreement, the firm was entitled to a $75,000 refundable deposit, and work would be billed at the rate of $350 per hour. Revellino did not discuss the terms of the 2004 retainer agreement with Romero before it was signed. Romero was billed 24 hours for this visit and conference, 12 hours for each attorney.
On behalf of the crime victims, the CVB filed a verified petition by order to show cause (hereinafter the CVB OTSC) on April 29, 2004, with the Supreme Court, Albany County, seeking a temporary restraining order (TRO) and preliminary injunction barring the firm, Romero, and/or others, from disbursing the settlement proceeds. The CVB OTSC, signed by the Honorable Leslie E.. Stein, directed Romero and the firm to show cause why a preliminary injunction should not be issued pursuant to the Son of Sam Law. Further, the CVB OTSC imposed a temporary restraining order, as follows:
“ORDERED, that pending the hearing and determination of this application and, if such application is granted, then also pending the service of an order granting a preliminary injunction upon [Romero] and his aforesaid attorneys, Kari Caulfield, Esq., and the law firm of Cronin & Byczek, LLP, the aforesaid *321 . . . and all other persons or entities that are now or will be (as garnishees or prospective garnishees) in possession of the aforesaid proceeds in the sum of $250,000, ARE HEREBY ENJOINED, FORBIDDEN AND RESTRAINED, FROM IN ANY WAY DISBURSING, DISTRIBUTING, ENCUMBERING, TRANSFERRING OR ASSIGNING, TO ANYONE AND FOR ANY REASON WHATSOEVER, ANY PORTION OF THE AFORESAID PROCEEDS, EXCEPT AS OTHERWISE SPECIFIED HEREINABOVE; AND EXCEPT INTO [ROMERO’S] COUNSEL’S SPECIAL BANK ACCOUNT AS PROVIDED IN DR 9-102 (a), (b) (1), THERE TO REMAIN UNTIL FURTHER ORDER OF THE COURT.”
On April 29, 2004, prior to being served with the CVB OTSC, the firm transferred the balance of the settlement proceeds from its escrow account, by check No. 12576 in the amount of $166,551.38, into the firm’s operating account at the First National Bank of Long Island. The memo on escrow check No. 12576 states “RETAINER FEE FOR JOSE ANTONIO ROMERO.” That day, hours after the firm had transferred the $166,551.38 from the escrow account to the operating account, the CVB OTSC was served on the firm via facsimile transmission.
The following day, on April 30, 2004, the firm transferred the sum of $144,651.38, from the operating account back to the escrow account, by check No. 11328, indicating in the memo section “TRANSFER TO ESCROW BALANCE OF RETAINER FOR JOSE ROMERO.” The sum of $21,900 was retained by the firm as earned fees. Also on April 30, 2004, the firm issued escrow check No. 12577, in the amount of $100, to Romero, which was the only disbursement ever made to him out of his $250,000 share of the settlement.
On or about June 10, 2004, LeBow filed an undated affirmation in opposition to the CVB’s OTSC (hereinafter the LeBow affirmation), in which he argued against the imposition of a temporary restraining order and preliminary injunction. The LeBow affirmation stated that the firm had held the settlement proceeds “until April 12, 2004,” and that the settlement proceeds had been “disbursed to Respondent, Jose Romero, along with all releases, letters of instruction, thank you letters, ‘Please tell your friends,’ etc.,” prior to the firm’s receipt of the CVB OTSC. The LeBow affirmation did not disclose to the court that the firm: (1) withdrew $83,448.62 of the $250,000 on or about March 16, 2004, (2) held the remaining $166,551.38 in *322 the firm’s escrow account until April 29, 2004, when it transferred those funds to the firm’s operating account, and (3) transferred $144,651.38 of the $166,551.38 back into the firm’s escrow account on April 30, 2004.
Between April 30, 2004 and August 6, 2004, the firm disbursed the remaining settlement proceeds, as follows:
[[Image here]]
By decision and order dated September 15, 2004, the Supreme Court, Albany County, denied the CVB’s motion to enjoin the firm from distributing any portion of the settlement proceeds. In relevant part, the court’s decision and order states as follows:
“In an affidavit in response by James LeBow, Esq., an associate in [the firm], he avers that the proceeds it received were distributed on April 12, 2004, prior to the time the temporary restraining order in this matter was issued on April 29, 2004. Based on that representation, the application to preliminarily enjoin the law firm is moot.”
On or about June 4, 2004, the firm filed a federal action on behalf of Romero, and itself, in the United States District Court for the Southern District of New York, challenging the constitutionality of the Son of Sam Law and/or its application to Romero (hereinafter the federal action). The firm filed an amended complaint in the federal action on or about October 14, 2004, removing itself as a party to the action. Within days, on or about October 19, 2004, the firm filed an application for its displacement as attorneys of record for Romero in the federal action. On or about December 10, 2004, the firm was discharged as the attorney of record for Romero in the federal action. Subsequently, the federal action was dismissed on or about March 31, 2006 (Romero v Pataki, 2006 WL 842177, 2006 US Dist LEXIS 14276 [SD NY, Mar. 31, 2006, No. 04-CIV-4294 (WHP)]). On appeal, on or about September 19, 2007, the United States Court of Appeals for the Second Circuit affirmed *323 the District Court’s decision, finding Romero’s claims to be either “manifestly meritless” or “manifestly frivolous” (Romero v Pataki, 241 Fed Appx 764, *766, *767, 2007 US App LEXIS 22405, **3, **6 [2d Cir 2007, No. 06-1926-CV]).
On or about August 9, 2006, the crime victims filed a wrongful death action against Romero in the Supreme Court, Bronx County. On December 17, 2007, a default judgment was entered against Romero on the issue of liability, and an inquest on the issue of damages was ordered. In response to a discovery request in connection with the inquest, the firm revealed how it had disbursed the settlement proceeds. In or about December 2008, a motion for contempt was filed in the Supreme Court, Albany County, on behalf of the crime victims, seeking to hold the firm in contempt for, among other things, circumventing and violating the temporary restraining order contained in the CVB OTSC, and falsely representing to the court that the settlement proceeds had been disbursed to Romero before the temporary restraining order was issued. In or about July 2009, the firm agreed to settle the motion by making a single payment of $125,000 to the crime victims in exchange for the withdrawal of the motion for contempt.
By virtue of the foregoing, charge one of the petition alleges that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of former Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]), charge two alleges that the respondent engaged in conduct which is prejudicial to the administration of justice in violation of former Code of Professional Responsibility DR 1-102 (a) (5) (22 NYCRR 1200.3 [a] [5]), charge three alleges that the respondent charged an excessive fee in violation of former Code of Professional Responsibility DR 2-106 (a) (22 NYCRR 1200.11 [a]), and charge four alleges that the respondent engaged in conduct that adversely reflects on her fitness as a lawyer in violation of former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).
As an experienced trial attorney and the partner in charge of the litigation practice for the firm, the respondent was actively involved in directing the decisions made by the firm in the communications with the CVB, the handling of the settlement proceeds, and in the firm’s affirmation in opposition to the CVB OTSC. The Special Referee properly determined that the timing of the events between April 27, 2004 and April 30, 2004, e.g., the telephone communications between the CVB and the *324 firm, the exchange of correspondence with the CVB, the five-hour firm litigation meeting, the visit to Romero at the Auburn Correctional Center, the transfer of the settlement proceeds from the firm’s escrow account to the operating account, and the quick re-deposit of a portion of those funds into the escrow account, defies any claim that the respondent’s actions and those of her litigation group were unrelated to the CVB. Rather, they evidence a concerted effort to circumvent the CVB TRO. Although the firm had control of the settlement proceeds when it was served by the CVB with the OTSC, the affirmation in opposition submitted by the firm in response to the CVB OTSC contained a false affirmation that the settlement proceeds had only been held until April 12, 2004, and had been released to Romero before the OTSC was served. It appears that the clear purpose of these misrepresentations was to defeat the OTSC, and to mislead the Supreme Court, Albany County, by failing to reveal that the firm had transferred the settlement proceeds into another account on the day it was served with the TRO. Indeed, that court relied upon the firm’s misrepresentations in its denial of the application for a preliminarily injunction, as reflected in its decision and order dated September 15, 2004.
Concerning the fees charged to Romero, notwithstanding the respondent’s claims that the petitioner failed to produce expert testimony, the Special Referee properly concluded that “it is clear from any standpoint that the fees . . . were excessive,” in light of the firm’s billing in advance of being retained by Romero for the constitutional challenge to the Son of Sam Law, and the total amount of fees charged Romero, which were virtually the entire settlement proceeds received by him.
Based on the evidence adduced, and the respondent’s admissions, the Special Referee properly sustained the charges. Accordingly, the petitioner’s motion to confirm the Special Referee’s report is granted, and the respondent’s cross motion is denied.
In mitigation, the respondent asks this Court to consider the settlement of the contempt action and payment of $125,000 to the crime victims, the respondent’s unblemished disciplinary history, including that she has not been the subject of any other disciplinary action in the nearly 11 years that have elapsed since the events that are the subject of this proceeding, as well as the evidence of her charitable endeavors, pro bono legal service, and good character. Nevertheless, the respondent has engaged in serious misconduct in her representation of Ro *325 mero, involving, inter alia, dishonesty, fraud, deceit, and misrepresentation, which conduct is prejudicial to the administration of justice and adversely reflects on her fitness as a lawyer.
Under the totality of the circumstances, we find that the respondent’s conduct warrants her suspension from the practice of law for a period of one year.
Eng, P.J., Skelos, Dillon, Balkin and Leventhal, JJ., concur.
Ordered that the petitioner’s motion to confirm the Special Referee’s report is granted and the respondent’s cross motion to disaffirm the report is denied; and it is further,
Ordered that the respondent, Linda Marie Cronin, is suspended from the practice of law for a period of one year, commencing August 21, 2015, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than February 22, 2016. In such application, the respondent shall furnish satisfactory proof that during said period she: (1) refrained from practicing or attempting to practice law, (2) fully complied with this order and with the terms and provisions of the written rules governing the conduct of disbarred, suspended, and resigned attorneys (see 22 NYCRR 691.10), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11 (c) (3), and (4) otherwise properly conducted herself; and it is further,
Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, Linda Marie Cronin, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding herself out in any way as an attorney and counselor-at-law; and it is further,
Ordered that if the respondent, Linda Marie Cronin, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in her affidavit of compliance pursuant to 22 NYCRR 691.10 (f).